BRYAN SCHRODER
United States Attorney

KELLY CAVANAUGH
Assistant United States Attorney
Federal Building & U.S. Courthouse
222 West 7th Avenue, Room 253
Anchorage, Alaska 99513
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: Kelly.Cavanaugh@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> ) No. <br> v. ) <br> ) **VERIFIED COMPLAINT FOR** <br> ) **FORFEITURE *IN REM*** <br> $37,425.54 IN UNITED STATES ) <br> CURRENCY, ) <br> ) <br> Defendant. ) | |

Plaintiff, United States of America, by and through counsel, alleges the following:

## I. NATURE OF THE ACTION

This is a civil action *in rem* brought to enforce the provisions of 21 U.S.C. § 881(a)(6), for the forfeiture of $37,425.54 IN UNITED STATES CURRENCY, which is hereby alleged to constitute moneys or other things

of value furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and moneys used or intended to be used to facilitate violations of 21 U.S.C. §§ 841, *et seq*.

## II. JURISDICTION AND VENUE

This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355, and 21 U.S.C. §§ 841 and 881. This is a forfeiture proceeding based upon violations of 21 U.S.C. § 841 and 881.

This Court has venue pursuant to 28 U.S.C. § 1395. Defendant $37,425.54 was seized within the District of Alaska.

## III. RELEVANT FACTS

The facts and circumstances supporting the seizure and forfeiture of Defendant $37,425.54 are contained in Exhibit 1, Affidavit of FBI Special Agent Derik Stone, which is attached hereto and fully incorporated herein by reference.

Defendant $37,425.54 IN UNITED STATES CURRENCY represents proceeds of, and was intended to be used or was used to facilitate a drug trafficking operation; and as such, Defendant $37,425.54 IN UNITED STATES CURRENCY is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## IV. CLAIM FOR RELIEF

WHEREFORE, Plaintiff United States of America prays that:

1. A Warrant *In Rem* issue for the arrest of Defendant $37,425.54 IN

*United States v. $37,425.54 in U.S. Currency*
Verified Complaint for Forfeiture *In Rem* Page 2
Case 3:20-cv-00296-JMK   Document 1   Filed 11/23/20   Page 2 of 3

UNITED STATES CURRENCY;

2. That due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. That judgment be entered declaring Defendant $37,425.54 IN UNITED STATES CURRENCY forfeited to the United States of America for disposition according to law, and;

4. For such relief as this Court may deem just and proper, together with the costs and disbursements of this action.

RESPECTFULLY SUBMITTED this 23rd day of November, 2020, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

*/s/Kelly Cavanaugh*
KELLY CAVANAUGH
Assistant United States Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on the filing date, a true copy
of the foregoing was served electronically on:

**Counsel for Defendant**

*/s/Kelly Cavanaugh*
Assistant United States Attorney

*United States v. $37,425.54 in U.S. Currency*
Verified Complaint for Forfeiture *In Rem* Page 3
Case 3:20-cv-00296-JMK   Document 1   Filed 11/23/20   Page 3 of 3

| UNITED STATES OF AMERICA, | ) | No. |
| --- | --- | --- |
| Plaintiff, | ) | |
| | ) | **AFFIDAVIT OF FBI SA** |
| vs. | ) | **DERIK STONE IN SUPPORT** |
| | ) | **OF VERIFIED COMPLAINT** |
| $37,425.54 IN UNITED STATES CURRENCY, | ) | **FOR FORFEITURE IN REM** |
| | ) | |
| Defendants(s). | ) | |

I, Derik M. Stone, being duly sworn, depose and say:

Background

1. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI), United States Department of Justice, assigned to the Anchorage, Alaska Division, Fairbanks Resident Agency. I have been a SA since September 2002 and am currently assigned to investigate criminal matters within the jurisdiction of the FBI. In this assignment, I have investigated a number of violations of Title 18, United States Code (U.S.C.), including, but not limited to, mail fraud, wire fraud, murder for hire, possession and distribution of child pornography, financial institution fraud, fraud against the government, bank robbery, false statements, health care fraud, and various drug crimes (Title 21).

2. During my law enforcement career, I have participated in numerous narcotics investigations during the course of which I have conducted physical and wire surveillance, executions of search warrants, made numerous arrests, and reviewed and analyzed recorded conversations and records of drug traffickers. Through my training, education, and experience, which has included debriefing cooperating drug traffickers, monitoring recorded conversations of drug traffickers, investigations, and conducting surveillance on numerous individuals engaged in drug trafficking, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement. I have also become familiar with various methods used to finance drug transactions and launder drug proceeds.

3. Based on my experience and the experience of other law enforcement personnel with whom I have consulted, I know that the distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of illegal controlled substances will typically obtain and distribute controlled substances on a regular basis, much like a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers do not always maintain a fully stocked cache of controlled substances at all times, and further, that many traffickers amass drug trafficking proceeds over a period of time until they are prepared to make payment for a shipment of drugs and/or pay a debt owed for drugs previously received for distribution.

4. I also know that drug traffickers commonly carry large amounts of currency on their person or maintain a large amount of currency in a location readily available to them. Because of the nature of maintaining and administering a drug trafficking enterprise, it is common for drug proceeds from sales to be either carried by the individual trafficker on their person, or cached at a site where the funds are readily available to them. Furthermore, drug traffickers commonly carry large amounts of currency on their person or have the currency readily available in order to purchase or restock illicit drugs for distribution.

5. Based on my experience and the experience of other law enforcement personnel with whom I have consulted, I know that persons who obtain income from illegal sources frequently structure their financial activities in such a manner as to hide and launder the proceeds by, among others, the following means:

    a. Creating entities that provide the façade of a legitimate business and source of income through which proceeds from illegal sources can be laundered;
    b. Placing bank accounts in names of these businesses or other individuals through which to funnel money; and
    c. Structuring financial transactions in attempt to avoid Currency Transaction Reporting requirements.

6. Based on my experience and the experience of other law enforcement personnel with whom I have consulted, I know it is common for members of drug trafficking organizations to utilize express parcel delivery services (i.e. FedEx, United Parcel Service, DHL, U.S. Postal Service Express Mail) to facilitate the movement of controlled substances and U.S. currency throughout the trafficking organization's area of operations.

7. Additionally, I know that certain indicators exist when persons use the U.S. Mail to ship controlled substances and proceeds of the sales of these substances from one location to another. Indicators for parcels that contain controlled substances and respective sales proceeds include, but are not limited to, the following:

    a. It is a common practice for the shippers of controlled substances and respective sales proceeds to use Priority Mail Express and Priority Mail because the parcels arrive faster and within two to three days. This service is also commonly used so the parcel can be tracked.
    b. Shippers of controlled substances and respective sales proceeds will often utilize cash as payment instead of credit or debit cards. These payment practices are used by narcotics traffickers to hide their true identity and make it difficult for law enforcement to identity them.
    c. These parcels, in many instances, contain fictitious return addresses, incomplete return addresses, no return addresses, the return address is the same as the addresses, or the return address does not match the place where the parcel was mailed from. These packages are also sometimes addressed to or from a commercial mail receiving agency (i.e. UPS Store). These address practices are used by narcotics traffickers and

money launderers to hide the true identity of the person(s) shipping and/or receiving the controlled substances and the respective sales proceeds from law enforcement.

   d. When the shipper mails controlled substances from a particular area or state, the proceeds from the sale of these controlled substances may be returned to the shippers. Based on my experience and consultations with other law enforcement personnel, there are known source states from where controlled substances might be mailed from, including California, Oregon, Washington, Arizona, Texas, New Mexico, Nevada, and Puerto Rico. It is also common for narcotics traffickers to ship substances from source states to larger cities in Alaska and then distribute the controlled substances from those cities to the smaller, more remote areas of Alaska. In addition, it is common for the proceeds from the sales of controlled substances to be mailed from Alaska back to the source state.
   e. In order to conceal the identity of the recipient, parcels containing controlled substances will often not require a signature upon delivery. This allows the carrier to leave the parcel at the recipient address without it being physically accepted by the intended recipient so they cannot be identified.

8. Based on my experience and the experience of other law enforcement personnel with whom I have consulted, I know it is common for drug traffickers to secure contraband, proceeds of drug sales, and records of drug transactions in secure or hidden locations separate from their residence in order to keep those illegal items and proceeds hidden from law enforcement.

9. The purpose of this affidavit is to establish probable cause that the seized $37,425.54 in U.S currency is proceeds of and was intended to be used in furtherance of drug trafficking. I believe said currency is also subject to forfeiture to the United States as proceeds of drug trafficking or property intended to be used to facilitate drug trafficking under Title 21 U.S.C. § 881(a)(6) based on violations of 21 U.S.C. § 841(a)(1).

10. The $30,698.54 in U.S. currency was seized from Joshua Burks during a search warrant at his residence located at 1910 Lillian Street, Fairbanks, AK. The search warrant was executed on 05/23/2020. The $6,725 in U.S. currency was seized from Burks during a search warrant of his safety deposit box located at Mt. McKinley Bank, 1380 University Ave, Fairbanks, AK. The search warrant was executed on 05/29/2020. The total amount seized from Burks during these two search warrants was $37,425.54.

11. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the forfeiture of said U.S. currency and does not set forth all my knowledge about this matter.

Statement of Facts

12. In March 2020, a confidential human source (CHS) advised law enforcement that Joshua Burks was engaged in the trafficking of illegal narcotics from his residence at 1910

Lillian Drive, Fairbanks, Alaska (hereafter referred to as "the residence"). According to the Alaska Public Safety Information Network, Burks resided at that residence.

13. The CHS has provided information in the past that has been corroborated by law enforcement. CHS has also, in the past, omitted information that s/he knew was an interest to law enforcement. CHS has a criminal history including misdemeanor assaults, multiple driving offenses, and theft offenses. Specifically, the CHS was convicted of the theft of 450 gallons of fuel in 2017 and has another theft conviction from 2010. The CHS, at the time of reporting, was currently under federal indictment for dug offenses.

14. On 03/05/2020 investigators with the Fairbank High Intensity Drug Trafficking Area Task Force (HIDTA) began a multi-day surveillance period on the residence. Each surveillance period was conducted between the approximate hours of 9:30 pm and 2:00 am. During this time, HIDTA observed a traffic pattern where multiple individuals would visit the residence, stay for no more than 30 minutes, and then depart the residence. During the surveillance period, HIDTA was able to observe 18 different vehicles visit the residence.

15. In addition to the 18 total vehicles, HIDTA observed a red 2008 Chevrolet Cobalt (AK Plate LAL889) visit the residence. The registered owner of this vehicle has several prior drug-related convictions.

16. During the surveillance period, HIDTA observed, on one particular date, Burks leave the residence and return within 20 minutes. Immediately after the return of Burks to the residence, a black Chevrolet Cobalt (AK Plate JPX508) arrived at the residence. While the driver remained in the vehicle, the passenger entered and exited the residence within a short period of time. The vehicle then left the area and traveled to the Fairbanks residence of a known drug dealer.

17. During the surveillance period, HIDTA observed vehicle traffic was non-existent on two separate occasions. HIDTA observed Burks exit his residence, enter his truck, and drive away. Burks returned in his truck a short time later, enter his residence, and within approximately ten minutes, the normal traffic pattern resumed.

18. For approximately two months (including the surveillance period previously described), HIDTA observed an average of 10 to 20 vehicles visit the subject residence per day. These visits generally lasted less than 10 minutes each and occurred usually between the hours of 2100 and 0500.

19. During a surveillance period on 04/28/2020, HIDTA observed a vehicle arrive at the residence, drop an adult female off, and depart. Approximately 10 minutes later, the same vehicle returned to the residence, picked up the female, and departed. Shortly after the vehicle departed, a Fairbanks Police Officer driving a marked patrol vehicle observed the vehicle violate a traffic law. The officer initiated a traffic stop on the vehicle and identified the driver as Arthur Sortman and the passenger as Jessica Simmons. Both Sortman and Simmons were known to the officer as drug users. The officer conducted a

20. legal search of the vehicle, Sortman, and Simmons. Simmons was found to be in possession of a small amount of heroin, several baggies, and two small digital scales. Simmons advised that she and Sortman had been buying illegal narcotics from "people around town." Neither Sortman nor Simmons would identify the source of the heroin.

20. On 04/29/2020, HIDTA listened to a telephone call to Burks from his brother, Kenny Burks (hereafter referred to as "Kenny"). The call was placed on 04/28/2020 at 1939 hours from Kenny, currently an inmate at the Fairbanks Correctional Center, to Burks. During the call, Kenny advised his brother that he was being released from incarceration on an ankle-monitoring program. Kenny added that he told the Pre-Trial Office (PTO) he would be residing at Burks' residence. Burks expressed concern that the PTO would need to inspect his residence and informed his brother that he would need a day to "clean [his] sheets." Your affiant believes that Burks was telling his brother that he needed some time to remove all the illegal narcotics (and evidence thereof) from the residence.

21. On 04/29/2020, HIDTA listened to a telephone call to Burks from Kenny (who was still incarcerated). The call was placed on 04/29/2020 at 1927 hours. During the call, Kenny advised his brother that his bail has been paid and he is simply waiting on Burks to email the PTO to let them know Kenny can stay at his residence; Kenny added that he can be there tomorrow. Burks immediately informed Kenny that if the PTO calls him and wants to inspect the residence, he will tell them he's out of town. He told Kenny that's "too soon" and that he needs "two days." Your affiant believes that Burks was telling his brother that he needs two days to remove all the illegal narcotics (and evidence thereof) from the residence.

22. On 04/30/2020, HIDTA listened to a telephone call to Maria Breks from Kenny (who was still incarcerated). The call was placed on 04/30/2020 at 2033 hours. During the call, Kenny advised Breks about his potential release. Breks then states, "It would be nice to know if they called Josh and wanted to look at his house or something…"

23. During the surveillance period, HIDTA observed Burks travel to Mt. McKinley Bank, located at 1380 University Ave, Fairbanks, AK.

24. On 05/23/2020, HIDTA executed a search warrant on the residence. That search warrant yielded the recovery of the following amounts of illegal narcotics (including packaging):

    a. Methamphetamine: 707.9 grams;
    b. Marijuana: 203.7 grams
    c. Prescription pills not prescribed to Burks: 129.1 grams; and
    d. Mushrooms: 481.8 grams.

25. In addition to the above listed illegal narcotics, $30,698.54 in U.S. currency was recovered within the residence. The currency was discovered stashed throughout the residence in different locations including, but limited to:

    a. Garage

    i. inside a beer "kegerator" alongside a small bag of methamphetamine
    ii. inside multiple tool chest drawers
  b. Dodge Pick-Up Truck
  c. Master Bedroom
    i. large trash bag full of cash inside a dresser drawer
    ii. on top of dresser
    iii. under mattress
    iv. inside a large glass jar on the floor
    v. inside a safe in the closet
  d. Kitchen
    i. inside cupboard
  e. Burks' person

26. Specific to the U.S. currency recovered in the Master Bedroom, approximately $4,000 in small denominations was discovered in a 13-gallon trash bag inside a dresser drawer. Mixed in with the cash were several shards of a crystalline substance. That substance field-tested positive for methamphetamine.

27. Furthermore, during the search warrant of Burks' residence, the same crystalline substance was observed throughout the residence to include kitchen counters, desks, work surfaces, laptop computer keyboards, on tops of mason jar lids, and digital scales. This substance field-tested positive for methamphetamine.

28. On 05/23/2020, during the execution of the search warrant at Burks' residence, three receipts from the U.S. Post Office located at 755 Fairbanks, Street, Fairbanks, AK were recovered. All three receipts documented a shipment of a flat-rate envelope or box from Fairbanks, AK to either Arizona or California via 2-Day Priority Mail. All three receipts showed the shipper utilized a tracking number. The receipts documented the following shipping dates, destinations, and container type:

  a. 04/18/2020: Scottsdale, Arizona (Flat Rate Envelope)
  b. 04/27/2020: Hemet, California (Flat Rate Envelope)
  c. 05/22/2020: Scottsdale, Arizona (Flat Rate Box)

29. On 05/23/2020, during the execution of the search warrant at Burks' residence, a safety deposit box key envelope was found on a dresser in a bedroom near where U.S. currency was recovered. Additionally, a safety deposit box key was found on Burks' personal key ring along with his vehicle keys. A Mt. McKinley bank statement was also located in the residence documenting an account owned by Burks.

30. On 05/29/2020, a search warrant was executed on a safety deposit box rented by Burks located at Mt. McKinley Bank, 1380 University Ave, Fairbanks, AK. A total amount of $6,725 in U.S. currency was seized from that safety deposit box.

Conclusion

31. Based on the foregoing, I believe there is probable cause to believe that the seized $37,425.54 in U.S. currency from the residence of Joshua Burks and his rented bank safety deposit box is proceeds of and was intended to be used or was used to facilitate drug trafficking activities by Burks and subject to forfeiture to the United States pursuant to Title 21, U.S.C § 881(a)(6).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

Executed on November 20, 2020 in Anchorage, Alaska

_____
Derik M. Stone, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 20th day of November 2020 at Anchorage, Alaska.

_____
Notary Public, State of Alaska
My commission expires on February 3, 2024

STATE OF ALASKA
NOTARY PUBLIC
Ana P. Hogue
My Commission Expires Feb 3, 2024